Veralyn **FRIERSON**, Plaintiff,

v.

**ATLANTA INDEPENDENT SCHOOL SYSTEM,** Defendant.

Civil Action No. 1:10–CV–3826–ODE–LTW.

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 31, 2014.

Borquaye A. Thomas, B.A. Thomas, Esq., Atlanta, GA, for Plaintiff.

Michael James Walker, Office of General Counsel—Atlanta Public Schools, Atlanta, GA, for Defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This civil action, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 ("Section 1981"), is before the Court on Defendant's objections [Doc. 73] to the Non–Final Report and Recommendation ("R & R") of United States Magistrate Judge Linda T. Walker [Doc. 70]. The R & R recommends that Defendant's Motion for Summary Judgment [Doc. 53] be granted in part and denied in part. Specifically, the R & R recommends (1) granting summary judgment on Plaintiff's race discrimination and retaliation claims under Section 1981; (2) granting summary judgment on Plaintiff's retaliation claim under Title VII; and (3) denying summary judgment on Plaintiff's race discrimination claim under Title VII. Defendant filed objections on September 9, 2013 [Doc. 73]. Plaintiff did not file objections. For the reasons set forth below, Defendant's objections [Doc. 73] are SUSTAINED, the R & R [Doc. 26] is ADOPTED IN PART and REJECTED IN PART, and Defendant's Motion for Summary Judgment is GRANTED.

Defendant filed its Motion for Summary Judgment on November 26, 2012 [Doc. 53]. Plaintiff filed a Response on December 17, 2012, which included the declarations of Patrick Crawford and Teresa Smith as Exhibits S and T [Doc. 54]. On January 7, 2013, Defendant filed a Notice of Objection to the Declarations of Teresa Smith and Patrick Crawford [Doc. 67]. The basis for the Notice of Objection was Plaintiff's failure to reveal Smith and Crawford in discovery disclosures. Plaintiff filed no response to the Notice of Objection. The R & R was filed on August 20, 2013. The parties were given fourteen days from receipt to file any objections [Docs. 70, 71]. Defendant filed objections on September 9, 2013 [Doc. 73]. Plaintiff did not file objections and did not respond to Defendant's objections.

▮ Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R & R to which Defendant objects. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 673–74, 100 S.Ct. ·2406, 65 L.Ed.2d 424 (1980). The remainder of the R & R, to which neither party offers specific objections, will be assessed for clear error only. *See Tauber v. Barnhart,* 438 F.Supp.2d 1366, 1373 (N.D.Ga.2006) (Story, J.).[1]

The R & R presents the facts of this case in a section labeled Factual Background [R & R 2–22]. While many of the facts in the Factual Background section are undisputed, that is not uniformly the case. Plaintiff's unilateral assertions which are not directed to opposing Defendant's undisputed facts are confusing. Because this case is before the Court on a motion for summary judgment, the Court rejects the Factual Background section as stated but will provide a statement of undisputed facts which incorporates the portions of the R & R's Factual Background section which are undisputed.

## I. *Factual Background*

Unless otherwise noted, the following facts are undisputed.

---

1. Plaintiff did not file objections to the R & R's conclusions that Defendant is entitled to summary judgment on both Plaintiff's Section 1981 race discrimination claim and her Title VII retaliation claim. The Court has reviewed those portions of the R & R and finds no clear error; thus, Judge Walker's findings on those claims are affirmed.

Plaintiff, an African–American female, worked in the Finance Department of the Atlanta Independent School System[2] ("AISS") as the Manager of Fixed Assets from March 2006 until her termination on January 30, 2009 [Defendant's Statement of Material Facts ("DSMF"), Doc. 53–2 ¶ 1]. Plaintiff's employment was at will and her annual salary was slightly over $83,000 at the time of her separation [*Id.* ¶¶ 55, 56]. Four to six employees in the Fixed Assets group worked under Plaintiff's supervision, depending on the availability of surplus funds called "SPLOST funds" [Pl. Dep., Doc. 57 at 19–22]. The Fixed Assets group was responsible for creating and maintaining records of AISS's fixed assets, and valuing these assets, including determining appropriate depreciation.[3] Data on assets was stored in a computerized business system, the Lawson system. Asset management is one component of the Lawson system [Pl. Dep. 79–80]. The Lawson system's Asset Management module ("A/M module") allowed creation of inventories of fixed and capital assets[4] within numerous specified classes and allowed entry of data to enable depreciation calculations [*see, e.g.,* Doc. 53–7 at 36, 40, 42]. During the time Plaintiff worked for AISS, the fixed assets inventory consisted of fixed assets valued at $5000 or more [Pl. Dep. 87]. Given that AISS is a very large school system, the fixed assets inventory obviously was substantial.

Charles Burbridge, a male Caucasian, was hired in August 2007 by AISS's Superintendent, Dr. Beverly Hall (African–American female) to be AISS's Chief Financial Officer ("CFO"). In this capacity he serves on AISS's senior cabinet, which advises the Superintendent on the operations of the district. Burbridge set about improving the Finance Department's organization and governance. He also wanted to improve the Department's ability to produce annual financial reports which would meet with the approval of the state auditing agency [Burbridge Dep., Doc. 58 at 13, 84]. Plaintiff does not dispute the foregoing facts.

In October 2007 Burbridge hired Nader Sohrab for an Executive Director position in the Finance Department [DSMF ¶¶ 4, 22]. Sohrab is male and is of Iranian descent.[5] Initially Sohrab was Executive Director of Shared Services; however, in that capacity he undertook a project to improve AISS's fixed assets accounting practices [Sohrab Dep., Doc. 60 at 14, 115–16; Lawson Decl., Ex. E, Doc. 53–4 at 63]. In April 2008 Burbridge hired Nicole Conley–Abram, an African–American female, for the position of Deputy CFO.[6] Sohrab

---

**2.** Atlanta Independent School System is the official name of the public school system for the City of Atlanta, Georgia. It is commonly referred to as Atlanta Public Schools or APS.

**3.** Plaintiff states that the Fixed Assets group did not generate the data for capital leases, charter schools, Education Reform Success and construction in progress. She asserts this data was generated by other groups although these items are considered fixed or capital assets. This assertion has not been disputed by Defendant and is accepted.

**4.** Defendant's Controller Nader Sohrab testified in his deposition that fixed and capital assets are "basically the same [thing]" [Soh-

rab Dep., Doc. 60 at 79]. The A/M module contains data for both physical assets such as buildings and for assets such as capital leases. The parties use the terms "fixed assets" and "capital assets" interchangeably.

**5.** Sohrab moved to the United States from Iran when he was twelve years old [Sohrab Decl., Doc. 53–3 ¶ 4]. Defendant's Exhibit 4, Doc. 53–4 at 63 identifies Sohrab's ethnicity as Persian.

**6.** In December 2007 Sherry Davis (African–American female) was hired to be Manager of Treasury Services. Sometime later she was promoted to be Special Assistant to Burbridge.

reported to Conley–Abram. Sohrab became Controller and Executive Director of Accounting in the Finance Department in May 2008. In this capacity he supervised four groups: payroll, accounts payable, accounting and financial reporting [Sohrab Dep. 19]. Both Plaintiff and Sohrab testified that Plaintiff was under Sohrab's direct supervision from May 2008 until her termination [Pl. Dep. 123–25; Sohrab Dep. 71; see also Burbridge Dep. 24]. According to Plaintiff's testimony, Sohrab also met periodically with managers of various groups within the Finance Department to discuss topics of mutual interest. In May of 2008 these groups and their managers included: Fixed Assets (Veralyn "Faye" Frierson, African–American female); Accounts Payable (Dale Butler, African–American male); Payroll (Saundra Burgess, African–American female); Grants (Shirley Boykin, African–American female); Accounting (CeCe Selles, African–American female); School Based Services (John Freightman, African–American male); and Treasury Services (Sherry Davis, African–American female) [Pl. Dep. 123–25].

For many years before he began working for AISS, Sohrab had been an auditor with the Georgia Department of Audits and Accounts [Sohrab Decl. ¶ 8]. This is the state agency that audits the financial statements and the Comprehensive Annual Financial Report ("CAFR") of each school district in Georgia [Id. ¶¶ 8, 14]. Sohrab had personally conducted the audits of the financial statements and CAFRs AISS submitted for fiscal years 2004–2006, and was very familiar with their considerable deficiencies in various areas, including fixed assets [Id. ¶¶ 8, 13; Sohrab Dep. 33–

35, 39–42]. In FY 2004 and FY 2005, AISS's record keeping was found to be so bad that the books were declared unauditable [R & R 7; Lawson Decl., Ex. E, Doc. 53–4 at 63].

When Sohrab became Controller in May 2008, Plaintiff had been Manager of Fixed Assets for just over two years. She was discharged on Sohrab's recommendation to Burbridge on January 30, 2009.

When Plaintiff was hired in March 2006, she was told by Ed Holloway (Director of Accounting and Plaintiff's supervisor at that time) that the Lawson A/M module had been unreliable; it did not allow AISS to provide information to the auditors swiftly and accurately [Pl. Dep. 78–80]. He charged her with the responsibility of investigating this problem, documenting the system's processes and recommending solutions [Id. 78–82]. According to Plaintiff's testimony, which is accepted for purposes of the instant motion, a "reimplementation" of the Asset Management module occurred under her supervision [Id. 82–83]. This reimplementation was specific to fixed assets [Id. 84]. Plaintiff made the recommendation at the end of 2006 [Id. 81]. In mid–2007 Wanda (no last name provided), a consultant, was hired [Id. 83]. Plaintiff and Wanda developed a plan for the reimplementation, which was completed sometime in 2008 [Id. 83–85].

In an April 16, 2008 email to Taleada Williams, Plaintiff had described the problems Fixed Assets had encountered in the still ongoing FY 2007 audit[7], including that her prior senior accountant (Melanie Williams) "did a lot of manipulating and

---

7. For FY 2007, as in previous years, AISS hired outside firm Banks, Finley, and White ("BFW") to conduct an internal audit and to prepare its CAFR [Plaintiff's Statement of Material Facts ("PSMF"), Doc. 55 ¶ 100; Pl. Dep. 93; Sohrab Decl. ¶ 13]. As noted elsewhere, the use of BFW's services did not preclude disastrous outcomes in the subsequent audit by the Georgia Department of Audits and Accounts.

plugging numbers in order for the CAFR to roll forward" [Def. Ex. 13, Doc. 54–23 at 55]. Also, the schedules her prior senior accountant had provided to BFW "were purely spreadsheets that had been manipulated to tie to the CAFR" [*Id.*]. In the same email she stated that "... no Beginning Balances for the Asset accounts were loaded when Lawson was implemented; therefore, there was no way for my group to reconcile the GL [general ledger] to the A/M system. These discoveries have resulted in PY adjustments for this year's [FY 2007] CAFR" [*Id.*].

Plaintiff recommended to Burbridge and Sohrab that the capital asset totals for FY 2007 be restated by about $20,000,000 [Pl. Dep. 186; Def. Exs. 12–13, Doc. 54–23]. Burbridge emailed Plaintiff and Sohrab on February 22, 2008: "Better to take our lumps in 07 or 08 than later. We need to come clean as soon as we have an issue" [Def. Ex. 12, Doc. 54–23 at 53]. Sohrab replied: "I am more concerned with our operational deficiencies in understanding what needs to be done. This is the 4th year that the same excuse was used to adjust the capital assets for millions of dollars. I just hope we do not have to take the same lumps in 2008. This also affects our E-rate funding if we cannot show improvement" [*Id.*]. Burbridge wrote back: "Excellent thinking. This is a large adjustment and if we do this repeatedly, we have a process that is not working" [*Id.*].

In 2007 or early 2008, AISS on Plaintiff's recommendation hired an outside vendor, Maximus[8], to conduct an inspection of AISS's fixed assets, and to create a comprehensive, up-to-date list [Pl. Dep. 85, 86]. Plaintiff worked with Maximus on this project [*Id.* 85]. Maximus completed its inventory in about May 2008 [*Id.* 86].

The new data was loaded into the system in stages by the Fixed Assets unit [*Id.* 114]. The job was completed on an unspecified date. Plaintiff estimated in her deposition that the files were received from Maximus "probably up until November 2008" [*Id.* 86] and alternatively, "up through September" [*Id.* 222]. However, on September 18, 2008, Plaintiff sent an email to Sohrab that said in part, "I wanted you to be aware of the financial impact of the Maximus inventory results.... For the first time ever, we have AM reports that support our activity for the year" [Pl. Dep. 223; Def. Ex. 26, Doc. 54–23 at 91–92].

*Note G*

FY 2007 (July 1, 2006 to June 30, 2007) was the last fiscal year for which AISS used outside accounting firm BFW to prepare its CAFR. In 2007, Plaintiff was informed that she would be in charge of preparing Note G for AISS's FY 2008 CAFR [*Id.* ¶ 23; Pl. Dep. 90–91, 106–09; DSMF ¶ 69]. This would be the CAFR covering the period July 1, 2007 to June 30, 2008. Until November 2007 Ed Holloway was still Plaintiff's supervisor; for this reason the Court infers Holloway made the assignment [*see* Pl. Dep. 105–08]. Holloway left the school system in November 2007 [DSMF ¶ 18]. Plaintiff testified that for FY 2007, external auditors were allowed to, "basically, complete [the CAFR], kind of handhold the District throughout 2007. But for 2008, we would be responsible for performing a CAFR and that's when the duty of completing a Note G became a task of mine" [Pl. Dep. 93–94].

Note G is a standard part of AISS's CAFR which is specific to capital assets. It is a single-page document, entitled "G. Capital Assets." Each of the Note G ver-

---

8. Apparently the company's name is now Asset Works and its software is called Maximus [Sohrab Dep. 61]. The Court uses the terminology supplied by Plaintiff in her deposition.

sions in the record states "Data taken from Lawson Fixed Asset Reports" in the upper left-hand corner. Note G is not in narrative format; it consists of a list of capital asset classes [9] down the left-hand side of the page with corresponding columns of dollar figures to the right which show (1) beginning values of each of the various classes of capital assets; (2) prior year adjustments if any; (3) beginning values restated to take into account a prior year adjustment [10] if any; (4) asset acquisitions within each class; (5) asset disposals within each class; (6) reclassifications if any; (7) CIP transfers; and (8) ending values of each asset class. Numerous samples of Note G, both for FY 2007 and FY 2008, are in the record [see, e.g., Doc. 53–7 at 36, 40, 42].[11]

Sohrab gave Plaintiff a deadline of September 15, 2008 to complete Note G for the 2008 CAFR. A string of emails between Plaintiff and Sohrab reflect that Plaintiff knew the deadline was September 15, 2008 [see Def. Ex. 23, Doc. 53–7 at 56]. On Friday, September 12, 2008, Plaintiff sent an email to Sohrab stating in part that "Note G is due on Monday" [Id.]. "You're doing all of your tasks well"

In September of 2008 (the record does not contain an exact date), Plaintiff and Sohrab met to go over Plaintiff's job description [Pl. Dep. 136]. This was part of an initiative by Nicole Conley–Abram to review job descriptions of all persons in the Finance Department [Sohrab Dep. 24–25, 104]. Plaintiff's job description is in the record as Defendant's Exhibit 7 [Doc. 54–23 at 17; see also Pl. Dep. 72–77]. It includes such duties as "Develop, communicate and maintain the District's Fixed Assets inventory," "Train, support and evaluate assigned staff," and "Review and approve financial data identifying and cor-

---

9. Based on the FY 2008 Note G versions which are in the record, it appears that the capital assets (governmental activities group) were (1) land, (2) construction in progress, (3) CIP—charter schools, (4) Education Reform Success, (5) buildings, (6) building improvements, (7) equipment, (8) furniture and fixtures, (9) vehicles, (10) charter schools, and (11) capital leases.

10. A "prior year adjustment" is an accounting adjustment made to correct a material error made in the prior year. See Bureau of the Fiscal Service, Prior–Period Adjustments Due to Corrections of Errors–Years Preceding the Prior Year, United States Department of the Treasury, 1 (June 3, 2010), http://fms. treas.gov/ussgl/approved_scenarios/ppa_due_ to_corr_of_err_yrs_% 20preced_py_060310.pdf (citing Federal Financial Accounting Standards No. 21). AISS made this adjustment by "restating" values for asset classes in the current year. In other words, the ending values for the prior year were carried forward to the current year and then "restated" to correct the error. Such restatements are viewed with suspicion by auditors and investors because they can obscure sloppy accounting practices or financial irregularities. In fact, the Financial Accounting Standards Board ("FASB"), officially sanctioned by the Securities and Exchange Commission, requires nongovernmental entities to disclose that their previously issued financial statements have been restated, provide a description of the error, describe the effect of the correction on each financial statement line item, and disclose the cumulative effect of the change in the statement of financial position. See FASB, Statement of Accounting Financial Standards No. 154: Accounting Changes and Error Corrections (issued May 2005), available at http://www.fasb. org/pdf/fas154.pdf. AISS, as a governmental entity, is not governed by these standards, but it is worth noting that transparency in disclosing and describing errors is a widely regarded best practice.

11. After June 30, 2008, both the FY 2007 and the FY 2008 CAFRs were being worked on simultaneously. The record does not state exactly when BFW turned in the 2007 CAFR to the state auditors. It is inferable that it was late summer or early fall 2008. The 2008 CAFR was completed after Plaintiff left AISS. The record does not state the date of completion.

recting problems insuring accuracy of the Fixed Assets inventory." Plaintiff testified in her deposition that she had never seen the job description before the September 2008 meeting with Sohrab. She denied having any knowledge until then that she was responsible for maintaining a Fixed Assets inventory [12] or correcting problems ensuring accuracy of the Fixed Assets inventory [Pl. Dep. 74–77]. Plaintiff states that in the context of this conversation concerning her job description, Sohrab said she was "doing all of [her] tasks well" and that she had "no worries" [Pl. Dep. 136]. Sohrab's deposition testimony was that this discussion was not an evaluation [Sohrab Dep., Doc. 60 at 96, 104, 107–08]. However, he was not asked specifically in his deposition and did not state in his declaration whether he made the statements referenced by Plaintiff during their discussion. Therefore, the Court accepts Plaintiff's assertion as to what Sohrab said as undisputed.

*Friction between Sohrab and Plaintiff*

On Monday, September 8, 2008 Bernadette Peterson sent an email jointly addressed to Sohrab and Plaintiff which said: "Can you please confirm if you are available to participate in interviews for the Fixed Asset Project Manager position next Monday, September 15, from 10:00 a.m. to 3:00 p.m.? Please advise" [Def. Ex. 23, Doc. 53–7 at 57]. On Friday, September 12, Plaintiff sent a return email to Glenn Melendez (apparently Peterson's assistant), with copy to Sohrab. Plaintiff's email said:

Glenn, I cannot commit to an entire day of interviewing. Finance has a September 15 deadline that my group is currently working on our part. I apologize for the late notice, but I am finally getting through my many emails from this week.

The only day that I am free next week is Wednesday.

[*Id.*]. On the same day Sohrab sent a reply email to Plaintiff with copy to Melendez which said: "Faye, this is an important initiative and your present [sic] is required. We had already discussed this date and need to move forward with this project. At the end this is your responsibility and you are required to play the lead role" [*Id.* at 56]. A few minutes later, Plaintiff sent an email back to Sohrab with a copy to Nicole Conley–Abram which said:

Nader, Note G is due on Monday and I believe that takes priority over this initiative. Glenn moved forward with scheduling these interviews without hearing back from me. If you are available, then you can sit in for Finance. This is an important initiative; however, I think that it is important that I make sure that my group has completed all necessary for the DE 46 and the CAFR.

We had not discussed September 15 for the interviews of the PM.

I would appreciate the courtesy to discuss these matters in person, rather [sic] include Glenn on an email with that message.

[*Id.*].

On Monday, September 15, at 7:40 a.m. Sohrab sent an email to Plaintiff, with copy to Nicole Conley–Abram, which said:

Faye, we understand that we all have deadline [sic] which we need to meet. Due to the current qualification of our report and material weaknesses reported on our Fixed Assets, you need to

**12.** Plaintiff commented, "my question would be, how do you develop the inventory?" [Pl. Dep. 75].

attend and lead this project. We can extend the deadline for Note G for one day, but your attendance is required for the interviews. This set on [sic] interviews *were discussed with you by Glenn and me, in person.* Please ensure that you are there and part of the interview process.

I would have appreciated the courtesy of a discussion but none was extended by you, only an email that you cannot attend.

[Def. Ex. 24, Doc. 53–7 at 59 (emphasis in original) ].[13]

On Monday, September 15, at 9:16 a.m. Plaintiff emailed Sohrab, with copies to Conley–Abram and Burbridge as follows: "Nader, per our conversation this morning, I will participate in the interviews this morning; however, I am concerned with the direction of this project and your communication" [*Id.* at 58]. The email then went on to recap Plaintiff's version of preceding events. The main points of the email are summarized as follows:

(1) the decision to hire a project manager had not been her decision. Further, she had voiced her opinion that the project manager position should be staffed with someone onsite rather than bringing in someone new.

(2) when Glenn Melendez had initially contacted her they had not discussed a date for interviews and "I have not yet met him in person."

(3) she had received an invitation to attend the interview but she had declined.

(4) Sohrab had come by her office that morning (September 15) and had told her that she had to be a part of the interviews

and that Note G could be delayed by "a day or so." Sohrab had stated to her that he was disappointed that she didn't come by his office instead of responding in an email with copy to Melendez. She had told Sohrab that it was inappropriate for him to copy Melendez on his September 12 email and his response had been "you started it."[14] Plaintiff's email then went on to say:

Not only was the statement unprofessional and unnecessary; the forum was inappropriate as well. My employees heard the entire conversation and you make the comment. In order for us to move forward, I need to know that you support me and respect my deadlines.

The email closed with the following:

I am requesting a meeting with you, Nicole and Chuck so that I can have a clear picture of the project that was decided for my area. I want to make sure I am clear on my role and who will support me with getting buy-in from the other departments.

Plaintiff's email also stated (in bold print) that her senior accountant, Tanisha Oliver, was "having a problem with the [d]epreciation calculation" for the 2008 Note G and "this was one of the same issues that caused a material weakness on the FY07 audit" [Def. Ex. 24, Doc. 53–7 at 58].

*Preparation of the FY 2008 Note G and the State Auditor's Report on the FY 2007 Financial Statements*

On September 18, 2008, Plaintiff emailed Sohrab [Def. Ex. 26, Doc. 54–23 at 91] stating that Maximus' work was complete;

---

**13.** Later that day, Plaintiff sent an email to Sohrab, Conley–Abram, and Burbridge confirming that Sohrab told her that the deadline "could be delayed a day or so" [Def. Ex. 24, Doc. 53–7 at 58].

**14.** According to Plaintiff's deposition testimony, Sohrab's response came after she told him he was being "childish" [Pl. Dep. 128–29, 208–14].

the inventory numbers had required adjustments (a total net prior year adjustment of $53.6 million), and stating "[f]or the first time ever, we have AM reports that support our activity for the year." The email attached a Note G for FY 2008 marked "draft" which highlighted certain entries and which noted in the lower left hand corner:

> * * *Highlighted areas are pending:
>
> CIP—Information needed from Facilities
>
> Charter Schools—Waiting on Audit reports
>
> Depreciation by Function code—Will need assistance from IT

[*Id.* at 93].

The September 18 version of Note G did have beginning balances listed for construction in progress and CIP charter schools. It did not have any dollar amounts in the column "CIP transfers."

According to Plaintiff's testimony at some point after September 18, 2008 Sohrab arranged for the CIP (transfers) dollar amounts for FY 2008 to be provided to Plaintiff by the Facilities department [Pl. Dep. 180–81].[15] Plaintiff obtained the Charter Schools information from another department [*Id.*].

On October 20, Plaintiff sent Sohrab a revised version of Note G for the 2008 CAFR along with an email which said "at this point, I consider Note G complete" [Def. Ex. 27, Doc. 53–7 at 64]. This version of Note G added a column of dollar amounts for "CIP transfers." It added a $16,000 prior year adjustment for charter schools. It did not contain any mention of capital leases, which later turned out. to represent a beginning value of $13,785,648 for FY 2008, and it did not acknowledge that this item was missing. The Court notes that $13,785,648 was the ending value for capital leases for FY 2007 [Doc. 53–7 at 44]. The October 20 version of Note G did not mention Education Reform Success, or acknowledge that it was missing. Education Reform Success is not mentioned in the FY 2007 Note G; it may have been a new capital item for FY 2008.

On about October 20, 2008, the Georgia Department of Audits and Accounts sent out an Independent Auditor's Report regarding the results of its audit of AISS's financial statements for FY 2007 [Pl. Ex. W, Doc. 54–25 at 2]. The report was addressed to AISS's Superintendent and members of the School Board, and also to the Governor of the State of Georgia, members of the General Assembly and members of the State Board of Education. Of particular importance to the instant case, the report said:

> The School System did not maintain adequate accounting records related to capital assets activity. The accounting records did not provide an adequate accounting for the $–20,399,249 restatement of beginning net assets for capital assets in the governmental activities, disclosed in Notes 2 and 5 to the basic financial statements. Capital assets additions and deletions were not properly accounted for in the governmental activities. In addition, accounting records did not provide adequate accounting of current year depreciation expenses and accumulated depreciation for the governmental activities and business-type activities. We were therefore, unable to examine sufficient evidence in support of the capital assets amounts and disclosures, and we were unable to satisfy ourselves by other means as to its accuracy.

[*Id.* at 4].

The state auditors found fourteen "material weakness audit findings" (a technical

---

**15.** The record does not clarify in what format these figures were supplied to Plaintiff.

term meaning that "a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected") [Def. Ex. 8, Doc. 53–7 at 7]. One of the findings was for fixed assets [*Id.* at 17]. The audit report pointed out that some of the "material weakness" findings, including the findings for fixed assets, were repeat findings from previous years [*see, e.g.,* Def. Ex. 8, Doc. 53–7 at 13, 14, 16, 18]. The state auditors issued a qualified opinion for FY 2007 [Sohrab Decl. ¶ 22].

The state auditors issued a separate report on the 2007 CAFR. Its findings paralleled the findings in the October 20, 2008 Independent Auditors Report. Regarding the FY 2007 CAFR, Plaintiff stated in her deposition that she had "sporadic" input [Pl. Dep. at 103] and also that she was in "constant" contact with the outside auditor, BFW [*Id.* at 162]. She asserts that Sohrab took the lead in assisting BFW in putting the 2007 CAFR together.[16] So far as the record reflects, Plaintiff was not an author of any narrative text in the 2007 CAFR and was not "the producer" of the final version of Note G which appeared in it. If anyone was "the producer" it was the outside firm, BFW, which signed off on the 2007 financial statements, and on the 2007 CAFR including Note G. Yet, it is undeniable that the lion's share of the fixed assets data BFW reported in the FY 2007 financial statements and the 2007 CAFR did come from data generated by the fixed assets unit. It is also undisputed that after Plaintiff and Wanda reimplemented the A/M module, the depreciation function did not work properly. Finally, the admitted errors by Plaintiff's prior senior accountant undermined the integrity of the Lawson system's data and processes, resulting in even greater unreliability of the system's output.

In addition, the record reflects numerous emails between Plaintiff and BFW's representatives regarding fixed assets data and formulation of Note G for FY 2007 [Def. Exs. 11, 14, 15, 16, 17, 18, 19, Doc. 53–7; Pl. Dep. 158]. In a February 6, 2008 email from Plaintiff to Francis Harley entitled "Capital asset audit issues," Plaintiff responded to eleven requests Harley had made for information. Harley was BFW's representative who was responsible for auditing capital assets [Def. Ex. 11, Doc. 54–23 at 51; Pl. Dep. 159]. The relevant point is not that Plaintiff was in charge of the FY 2007 Note G; it is simply that her argument in her brief that she had no responsibility for the FY 2007 CAFR, or Note G in the 2007 CAFR, is at variance with the undisputed facts in the record.

On about November 3, 2008, Dr. Hall, Superintendent of AISS, received an anonymous letter, the main points of which were the following:

> I am an employee of Atlanta Public School and was recently contacted by a local television station to give an anonymous statement as a member of the Finance staff. I am not sure how I was chosen or if I am the only person who was contacted. I have assumed that the word is out about our recent State Audit. I am not sure how I became a target or if I am the only target....
>
> I thought that it would only be fair for you to hear first hand what I would tell the media if I decide to grant the interview. Their questions to me were

---

**16.** This is correct in the sense that Sohrab took on project manager status for solving AISS's audit problems upon his employment with AISS in November 2007 [Sohrab Decl. ¶ 10].

around my opinion of the changes in Finance and the leadership. I have witnessed numerous CFO, Directors and managers, but never have I seen a team go from great momentum to falling apart as of recent. . . .

Today things are sadly different. . . . The division really became visible when Mr. Sohrab was named Controller. He brought pure division with all of us. It appears to most of us that he has never worked on a team nor with diversity. . . .

It is not by chance that our Audit findings increased from last year. We were all working hard to eliminate these findings before management changed. When the FY07 Audit began, the managers wanted all employees to be involved and build relationships; however, when Mr. Sohrab was named Controller and the point person for the Audit, he created road blocks for all of us. It was obvious to all of us that he wanted to be the center of all discussion and he didn't respect any of us who had been here for a while. . . . I have sat back and watch a lot go on in Finance and I can truly say that the result of our Audit is a pure reflection of Mr. Sohrab's inability to work with others. . . .

I am asking that you please address these issues before our FY08 Audit. If you don't trust what I am saying, I encourage you to talk to others in the Finance team. . . . Reach out to the staff and hear their voices. I am almost certain that I am not the only employee that has been contacted by the media; however, I don't want to air our dirty laundry to the public. . . .

[Def. Ex. 2, Doc. 58 at 104–06]. While the anonymous letter was addressed to Dr. Hall, copies were sent to members of the City of Atlanta's Board of Education.

On November 12, 2008 Plaintiff emailed Sohrab, attaching an updated FY 2008 Note G. The email said, "Attached is the updated Note G with the corrections to the formulas. Note, there has been a revision due to Discontinued Buildings that Facilities omitted when Maximus performed inventory. Thanks for the catch." On Tuesday, November 18, Sohrab emailed Plaintiff: "After a review of the new note columns L & N on line 47 are now correct but line 51 does not add across when adding columns F & H. Let's make sure that all columns and cells add across and down" [Def. Ex. 32, Doc. 53–7 at 68]. Plaintiff emailed in response on November 18: "I will have Tanisha take another look at the formulas" [Id.]. In a later email on November 18 Plaintiff said, "Tanisha has reviewed and corrected all formulas. The Nutrition/Business type just seemed to slip through the cracks" [Def. Ex. 33, Doc. 54–23 at 105]. On November 26, Plaintiff emailed Sohrab, stating: "Attached is the revised Note G for FY08 to reflect the Beginning Balances that you submitted for the CAFR" [Def. Ex. 34, Doc. 53–7 at 71]. The attached revised Note G, which was marked "Draft," for the first time added one new beginning balance for "Buildings." Also, it included Capital Leases at a beginning balance of $13,785,648 and ending balance of $13,785,648. It also added "Education Reform Success" with beginning and ending values of $7,609,587 [Id. at 72].

On January 21, 2009, Plaintiff emailed Sohrab on the subject "FY 2008 Note G—PY Reconciliation" [Def. Ex. 39, Doc. 53–7 at 73]. The attached revision of Note G did not include Capital Leases or Education Reform Success [Id. at 74], even though they had been included in the November 26 version of Note G.

On Friday, January 23, 2009 Plaintiff emailed Teresa Smith (Financial Reporting Manager) with a copy to Sohrab on the subject "Note G Capital Leases–Final." The email said "Here is the updated Note

G with the Capital Lease information" [Def. Ex. 40, Doc. 53–7 at 75]. The attached copy of Note G did include Capital Leases in the list of assets at a beginning balance of $13,785,648 with a prior year adjustment of $2,638,066 for an ending balance of $11,147,582 [*Id.* at 76]. This version, however, did not mention Education Reform Success even though it had been included before in the November 26 version.

On January 30, 2009 Plaintiff was terminated by letter from the Superintendent, Dr. Hall [Def. Ex. 41, Doc. 54–23 at 127; Pl. Dep. 16].[17]

After Plaintiff's termination, AISS effected a reimplementation of the A/M module [Burbridge Dep. 72–73]. When the 2008 CAFR was completed and turned in, the state auditors made one or two material weakness findings, at least one of which was fixed assets [Sohrab Dep. 126]. This time there was an unqualified opinion [*Id.*]. In 2009, there was only one material weakness finding, again in fixed assets, and in 2010, there were no findings [*Id.*].

*Personnel changes after Plaintiff's Departure*

In December 2008 Burbridge and Sohrab hired Crissi Calhoun, Caucasian female,[18] and Teresa Smith, African–American female. They both were given the title Accounting Supervisor.

AISS did not hire a new manager for the Fixed Assets group after Plaintiff left. Immediately after Plaintiff's termination in January 2009 her duties were split between Teresa Smith and Crissi Calhoun. The accounting functions were placed under Crissi Calhoun and the financial reporting functions were placed under Teresa Smith [Sohrab Decl. ¶ 32]. They both were given the title Accounting Manager [*Id.* ¶¶ 32, 33]. At some point in the summer of 2009 Crissi Calhoun was made Manager of the Accounting group. Three employees from the Fixed Assets group were placed in the Accounting Group under Crissi Calhoun's supervision. Sandy Mormon, a female Caucasian who had been a consultant, was hired into the Accounting Group. Teresa Smith became the Manager of the Financial Reporting group; two employees worked in this group under Smith [*see* Pl. Ex. B, Doc. 54–3].

*Testimony about Sohrab's conduct and demeanor*

Frierson testified in her deposition about her perceptions of Sohrab's conduct and demeanor. She said she told CFO Burbridge before Sohrab was made Controller that Sohrab "seemed a little rude, not a team player" [Pl. Dep. 153]. She described a management team meeting prior to April 2008 when Sohrab was "rude and kind of condescending" [*Id.* 123] to the black women in the group. She did not

---

**17.** Sohrab recommended to Burbridge that Plaintiff be fired [Sohrab Dep. 113, 124, 126–27]. Burbridge had never worked directly with Plaintiff but was aware of Sohrab's dissatisfaction with her work. He was also aware of Plaintiff's dissatisfaction with Sohrab as she had complained to Burbridge. Burbridge accepted Sohrab's recommendation [Burbridge Dep. 34–37, 40–41, 43]. Burbridge told Sohrab to work with Human Resources to carry out the termination [*Id.*]. Human Resources submitted the paperwork to Superintendent Beverly Hall, who issued

Plaintiff the notice of termination [Def. Ex. 41, Doc. 54–23 at 127].

**18.** Calhoun was the only Caucasian manager in the Finance Department in December 2008. She had been a consultant with AISS during 2008. She was assigned with generating more reader-friendly financial reports through a reporting software called "Crystal Report" [Sohrab Dep. 73–75]. She also prepared checklists for managers to use in preparing for year-end financial reporting [Pl. Dep. 199–200; Def. Ex. 21, Doc. 53–7 at 47].

name the persons who were the object of Sohrab's alleged rudeness. The individuals present were Karen Amos (Budget Director, African–American female); Saundra Burgess (Manager, Payroll, African–American female); Dale Butler (Manager, Accounts Payable, African–American male); John Freightman (Manager, School Based Services, African–American male); Sherry Davis (Manager, Treasury Services, African–American female); CeCe Selles (Manager, Accounting, African–American female); plus Plaintiff as Manager of Fixed Assets and Sohrab [*Id.* 123–25]. Plaintiff reported Sohrab's rudeness to Colinda Howard (a lawyer who worked in the Office of Internal Resolution; African–American female), who Plaintiff states took no action [*Id.* 123, 125].

Plaintiff also testified in her deposition that at management meetings where Crissi Calhoun, a white consultant (or two other white female consultants) were present Sohrab "... would allow them to speak. If he disagreed with them, he voiced it in a different way. If he disagreed with us, he would try to cut us off...." [*Id.* 127]. She testified that Sohrab did not similarly mistreat the African–American male managers Dale Butler and John Freightman [*Id.*]. He did not say negative things to them when they were talking. "He wouldn't cut them off, ever. He was very agreeable with them when they spoke on an issue, even if he did not agree on it, he was never combative or anything like that; but with the black females, he would go back and forth, back and forth. And he

never did that with the white females, that would be in the meetings" [*Id.* 127–28][19].

Burbridge testified in his deposition that there were multiple employee complaints regarding Sohrab's "management style" and that he took steps to help Sohrab "improve his style" and "work[ ] on his communication skills" [Burbridge Dep. 80–81]. He stated he had had Nicole Conley–Abram, Deputy CFO, and Sherry Davis, Manager of Treasury Services, work with Sohrab on this issue [*Id.* 89].

Plaintiff testified that before April 2008 she reported to Colinda Howard that Sohrab had made a racist comment. Plaintiff stated she had heard Miracle Carroll (African–American female, accountant in the Finance Department) say to Sohrab that she was going to lunch; he then said "are you going to get fried chicken?" Carroll then said, "Why no, why would you say that?" And he said "don't you all like fried chicken?" [Pl. Dep. 151]. Plaintiff was disappointed in Howard's reaction to her complaint. Plaintiff testified: "I wasn't expecting her to say he could fire me for wearing a red dress if he didn't like red" [*Id.* 152]. Plaintiff testified: "So, I just felt like there was no support there on how to deal with a manager that you felt like just did not like you" [*Id.* 152–53].

In October 2008 Nicole Conley–Abram told Plaintiff she did not think Plaintiff and Sohrab were going to be able to work together; Conley–Abram asked Plaintiff if she would like another assignment within AISS. Plaintiff said she did not want a

---

**19.** Defendant's Finance Department employed a large number of consultants in 2008. Those identified by name in the record are: Sandy Mormon, Holly Keller, Jill Overton, Crissi Calhoun, Felicia Johnson, Anita Fox, Dorcas Henegan, Janice Washington and Victor Douglas [Pl. Dep. 11, 100, 119, 126, 134, 141, 142, 143, 150, 151, 197, 220, 240, 252]. Near the end of 2008 Defendant also hired

Robert Jones (presumably a consultant) as Project Manager for Fixed Assets [*Id.* 111]. Plaintiff identifies Mormon, Keller, Overton and Calhoun as white. The remaining individuals are not identified by race. Plaintiff also identifies Mormon, Keller and Calhoun as persons who were later hired by Defendant either at the end of 2008 or later.

position outside the Finance Department because her field is accounting [*Id.* 118].

Plaintiff was asked this question in her deposition:

Q. Is it your position that he behaved this way to you because of your race?

A. I can't ... I don't know why he behaved that way toward me. I don't know. It could be.

[*Id.* 248].

On or about Friday, October 10, 2008 Miracle Carroll reported to Plaintiff a remark Sohrab had made in her presence. Plaintiff did not hear Sohrab's remark and has no first-hand knowledge of what Sohrab said. The record contains numerous versions of what Sohrab allegedly said. Plaintiff gave the following ·testimony in her deposition:

Well, when Miracle came to me, I was the fixed asset manager.. At the time, Miracle did not have a manager. And she came in my office, very upset one day, stating that she was in a conversation with Mr. Sohrab and he made the comment that [Defendant's] problem was that it was run by a bunch of black women. And I, in turn, called Nicole Conley–Abram who [Sohrab] reported to, to ask her, you know, what should I do? Should I refer Miracle to her? And she informed me to call OIR. So, I then called OIR. They gave me Colinda Howard's number. I called Colinda Howard and she told me to give Miracle her cell phone number.... Nicole asked me to document [the incident].

[*Id.* 12–14]. Defendant objects to this testimony concerning Sohrab's remark as hearsay. The R & R determined that Plaintiff's testimony is not hearsay. Also, the R & R determined that Conley–Abram's direction "to call OIR" is an admission of a party opponent which is not

hearsay. Defendant's objections are considered below in the Legal Discussion section.

On Monday, October 13 Miracle Carroll sent an email to Colinda Howard, stating as follows:

Here's the scenario (Short Version):

Co-worker's are huddled around a cubicle. A conversation started up ... upper manager-Male, consultant (Blk Female), employee (Me) ...... needless to say, we were told that we don't listen. A consultant said, "You haven't heard that Black Women·don't know how to be quiet?" I clinched my teeth. Manger said, "Oh, I got it now." Consultant continued, "My bother say that all the time about black women." Manager mumbles, "that explains what the problem is here at APS." I was stunned.

[Pl. Ex. H, Doc. 54–8 at 3–4 (errors in original) ]. Defendant specifically states it has no objection to the Court's consideration of this evidence [PSMF ¶ 207; Defendant's Response to Plaintiff's Statement of Material Facts, Doc. 66 ¶ 207]. This concession by Defendant waives not only any potential hearsay objection, but also waives any objection Defendant might have based on the fact that the statement is contained in a document, rather than in deposition or declaration testimony.

On October 14, 2008 Plaintiff sent a letter to Conley–Abram memorializing Plaintiff's version of what Carroll had said to her:

Per our conversation, earlier this week, Miracle Carroll came into my office upset over a comment that Nader made while in a conversation with she and Anita. Miracle stated that she, Nader and Anita were discussing something related to Accounting, when Anita interrupted Nader and he said "Let me finish". Miracle stated that [Anita] then replied "Don't you know you can't talk

over a black woman?" Miracle then stated that Nader said "Well, that explains [AISS's] problems, being run by a bunch of black women".

Miracle appeared very upset when she entered my office. After listening to her, I called you because Miracle has no direct Manager at this time. You then instructed me to give Colinda Howard a call. I called Ms. Howard and explained to her what Miracle told me and she told me to give Miracle her cell phone number and she would help her. I did exactly that and asked Miracle to call her as soon as possible.

[Lawson Dep., Doc. 59 at 99; Def. Ex. 9, Doc. 53–7 at 29]. Defendant objects to this evidence concerning Sohrab's remark as hearsay; the R & R ruled that it is not hearsay. Defendant's objection to the R & R's ruling is considered below in the Legal Discussion section.

A third version of the same incident was offered in a February 12, 2009 email sent to Howard by Anita Fox, an African–American female who worked as a consultant in the Finance Department:

I was involved in a very casual conversation with my Comptroller, Nader Sohrab, along with a co-worker, Miracle Carroll. The decision was centered on the way we handled the process for a particular account. Nader was explaining how it should be done and Miracle was debating her point. After the two of them went back and forth for a few minutes, I made the comment, generally speaking, saying, "My brother has al-

ways said black women don't listen." Nader looked at me as if he didn't know what to say. After a few moments, he said "really, is that what it is?" Another co-worker walked up and needed to ask Nader a question, he then walked into his office and we all followed him in. That was the end of the general conversation and we were back to business as usual.

[Lawson Dep. 100, Def. Ex. 2, Doc. 53–12]. This version of Sohrab's comment is acknowledged in the R & R. Neither side has objected to this evidence and thus it is admissible.

Sohrab was asked about the Carroll incident in his deposition. He denied having made any statement involving race, stating that he had been "shocked" by Fox's statement and that he had walked away without comment upon hearing Fox's statement [Sohrab Dep. 94–96]. This is admissible evidence.

In January 2009 AISS undertook an investigation of the allegations in the November 3 anonymous letter to Dr. Hall [DSMF ¶ 116; Lawson Decl. ¶ 14]. It hired Penn Payne, a lawyer, to conduct the investigation [Lawson Decl. ¶ 14]. Payne's report is directed to the claims in the anonymous letter but includes discussion of Plaintiff Frierson's termination and her claim that Sohrab discriminated against her [see generally Lawson Decl., Ex. E, Doc. 53–4 at 59–85]. Ms. Payne interviewed seventeen persons in the Finance Department and produced a confidential report[20] which she provided to AISS on

---

**20.** One of the difficult issues presented is the question whether to consider the substance of the two confidential reports prepared by Ms. Payne. Since the reports are based on interviews Payne conducted, they contain hearsay and the opinions and conclusions of Ms. Payne. Yet both sides proffered the reports, or parts of them, in connection with Defen-

dant's motion for summary judgment. Neither side raises any objection to any part of the reports. The Court will not adopt or consider the conclusions in the reports (which are favorable to Defendant) because of a preference for primary evidence and the fact that the employee interviews were given under a promise of confidentiality. The Court will

about April 16, 2009. The interviewees included Teresa Smith and Patrick Crawford, employees in the Finance Department who are African–American. Payne's report ("First Payne Report") is in the record as Exhibit E to Nicole Lawson's Declaration [Doc. 53–4 at 59–85].

On April 30, 2009 Plaintiff filed a timely charge of race and gender discrimination with the EEOC based on her termination [Complaint, Doc. 1 ¶ 11].

On June 30, 2009 AISS revised its internal rules to redefine the term "fixed assets" to mean "land of any value and property valued at $50,000 or more" with certain other qualifications.

In October 2009, AISS hired lawyer Penn Payne again, this time to investigate a race discrimination complaint filed with the EEOC by Shirley Boykin in September of 2009. Boykin, an African–American, was Manager of the Grants unit in the Finance Department. She reported to Sohrab. According to the Second Payne Report she was hired by Sohrab in August 2008 [Lawson Decl., Ex. E, Doc. 53–4 at 70]. She was terminated effective November 13, 2009. Ms. Payne interviewed seventeen individuals in the Finance Department, including Teresa Smith, Patrick Crawford and Shirley Boykin. Payne's report ("Second Payne Report") is in the record as Plaintiff's Exhibit N [Doc. 54–14].

The Second Payne Report was provided to AISS on about October 17, 2009. The Report was supplemented by a letter dated October 19, 2009 which repeated some of what was in the Report and which also informed Defendant that "other employees might come forward with claims of race

refer to material in the reports in ruling on Plaintiff's argument Defendant had adequate notice of what testimony Teresa Smith and Patrick Crawford would give if they were to

discrimination" [Pl. Ex. N, Doc. 54–14 at 3].

A right to sue letter was issued by the EEOC on or about August 16, 2010 [Complaint, Doc. 1 ¶ 12].

The instant case was filed on November 19, 2010. The initial complaint charged race and gender discrimination; however the amended, final complaint charges only race discrimination.

In 2010 the Fixed Assets unit was formally abolished and Patrick Crawford lost his job [Burbridge Dep. 69]. In May 2012 Teresa Smith resigned her employment with AISS [Smith Decl., Doc. 54–21 ¶ 4].

On or about July 31, 2012, in response to a subpoena, copies of both of Ms. Payne's reports and the October 19, 2009 letter were sent to Plaintiff's counsel by Ms. Payne. Presumably they were provided to Defendant's counsel as well, either then or perhaps earlier.

The discovery period in the instant case ended on October 26, 2012. Crawford and Smith signed declarations supporting Plaintiff's race discrimination claim on December 11, 2012 and December 14, 2012, respectively. They were filed on December 17, 2012 along with Plaintiff's response to Defendant's motion for summary judgment.

## II. *Legal Discussion*

### A. *Evidentiary Rulings*

The R & R determined that the declarations of Patrick Crawford and Teresa Smith are admissible to prove that Sohrab has a bias against black women and African–Americans generally, and that Defendant's stated reason for firing Plaintiff is

testify on Plaintiff's behalf, and for certain other purposes, which are identified by citations to the Payne reports.

unworthy of credence. It also determined that there is admissible evidence that Sohrab said "Defendant's problem is that it is run by a bunch of black women." Defendant specifically objects to these rulings. After a de novo review, the Court sustains these objections for the reasons stated below.

### 1. *Patrick Crawford and Teresa Smith Declarations*

The R & R considered the declarations of Patrick Crawford and Teresa Smith in determining that Plaintiff had made a sufficient showing of pretext. Defendant objects to consideration of this evidence based on Plaintiff's failure to reveal these witnesses and the subject of their testimony in the initial disclosures as required by Federal Rule of Civil Procedure 26(a). In its Notice of Objection [Doc. 67], and again in its objections to the R & R [Doc. 73 at 17], Defendant argues:

> [T]he purported evidence in the declarations, and upon which Plaintiff relies, is inadmissible under Fed.R.Civ.P. 37(c)(1) because Plaintiff failed to disclose the identity of either Patrick Crawford or Teresa Smith as a witness in her initial disclosures [Doc. 18] or amended initial disclosures [Doc. 29]. Plaintiff also failed to otherwise disclose Crawford or Smith at any point during discovery.... Plaintiff also never supplemented her discovery responses to identify either Smith or Crawford as required under Fed.R.Civ.P. 26 and 33.... Consequently, the discovery period expired, and considerable effort and resources have been dedicated to the preparation of Defendant's summary judgment motion, even though Defendant was deprived of

the opportunity to take the depositions of Teresa Smith and Patrick Crawford. [Doc. 67 at 2–3]. The R & R overruled this objection because "the witnesses Defendant seeks to exclude are crucial to Plaintiff's case" and "the failure to disclose Crawford and Smith was [not] harmful or prejudicial to Defendant because Defendant has been made aware of both of these witnesses" [R & R 24]. The Court rejects both of these rationales.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." The disclosure rule is enforced through Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[21] Moreover, under Rule 26(e)(1)(A), supplementation of incorrect responses is required. Thus, "the obligation to disclose pertinent parties is continuing [throughout the case]." *F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F.Supp.2d 1167, 1179 (N.D.Ga.2008) (Pannell, J.). Finally, the non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 Fed.Appx. 821, 824 (11th Cir.2009) (citing *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687,

---

**21.** The Rule further provides: "In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions...." Fed.R.Civ.P. 37(c)(1).

697 (N.D.Ga.2006) (Evans, J.)); *see Go Med. Indus. Pty. v. Inmed Corp.,* 300 F.Supp.2d 1297, 1308 (N.D.Ga.2003) (Thrash, J.).

██ Here, Plaintiff did not disclose Crawford and Smith as persons with information which could be used to support Plaintiff's claims either in her initial disclosures or in response to Defendant's similar interrogatories. Plaintiff made no supplemental disclosures.

Plaintiff first revealed her intention to use Crawford and Smith as witnesses and the substance of their testimony when she filed their declarations on December 17, 2012 [Doc. 54] in response to Defendant's motion for summary judgment. The declarations were filed nearly two months after the discovery period expired on October 26, 2012 [Doc. 50].

The R & R noted that "the witnesses Defendant seeks to exclude are crucial to Plaintiff's case" [R & R 25]. The R & R cited one Eleventh Circuit case for the proposition that courts should consider "the importance of the testimony" when deciding whether to exclude witness testimony under Rule 37(c)(1) [R & R 24 (citing *Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.,* 389 F.3d 1339, 1353 (11th Cir.2004)) ]. However, the actual holding in *Bearint* does not support the outcome Plaintiff seeks. The plaintiffs in *Bearint* challenged the district court's refusal to permit a lay witness to offer testimony at trial because he was not disclosed on plaintiffs' pretrial witness list. *Id.* at 1343, 1353. But the Eleventh Circuit declined to reverse the district court's exclusion of the witness "regardless of the importance of [the witness's] testimony." 389 F.3d at 1353. The Court reasoned:

> The Bearints first mentioned [the witness's] existence on the first day of trial. They allege that they had only recently learned of his existence and thus were unable to include him in their pretrial disclosures. In and of itself, this delay may have been excusable. But their subsequent delay in disclosing the full nature of [the witness's] testimony was not [excusable].... The Bearints could easily have made this disclosure on the opening day of trial, and offer no plausible reason for their failure to do so.

*Id.; see also Romero v. Drummond Co.,* 552 F.3d 1303, 1321 (11th Cir.2008) (finding that "the district court did [not] abuse its discretion when it refused to admit testimony from several [late-disclosed] witnesses who could have offered 'smoking gun' evidence . . .").

Plaintiff did not file a response explaining how the failure to disclose Crawford or Smith was substantially justified. The R & R did not determine that Plaintiff's failure was substantially justified; it focused only on whether the failure of disclosure was harmless, and found it was harmless. The R & R found that Defendant's counsel should have been alerted to Crawford and Smith's status as witnesses who might support Plaintiff's claim after receiving a copy of the October 19, 2009 letter from Penn Payne to AISS (which was received along with the two Payne reports) which identified Crawford and Smith as employees who "might come forward with claims of race discrimination or race/gender discrimination" [Pl. Ex. N, Doc. 54–14 at 3]. The two Payne reports were sent to Plaintiff's counsel on or around July 31, 2012 [*see* Doc. 39]; presumably, defense counsel got them either at that time or perhaps earlier. Discovery closed on October 26, 2012 [Docs. 49, 50].

The R & R concluded that non-disclosure was harmless because the witnesses are Defendant's former employees and "were made known to the Defendant by

their counsel almost a year before the instant lawsuit was filed" [R & R 26].

The First Payne Report stated that Smith had expressed a negative view of Sohrab ("he has the capacity to explode"; "condescending") but she did not mention race discrimination [Doc. 53–4 at 70]. Crawford expressed a very positive view, as follows:

> ... Patrick Crawford said that Nader is a "genius. I'm learning more in 3 weeks than in the 17 years I've been here. He gives me confidence; I feel appreciated; and I pick up his work ethic. I am very happy working with him." [Doc. 53–4 at 68].

Patrick Crawford said that Nader is not at all divisive. He's a team builder. He's friendly, he talks and jokes but he is serious about the work. He's so complimentary, he makes you think you're the best employee in the world. Mr. Crawford can't imagine people complaining about him. Maybe it's the managers whom he's trying to get to work. He comes early and leaves late. His motor is running 100 miles per hour. He is always polite—that's the way he is with everybody. [Doc. 53–4 at 72].

Patrick Crawford said that he has been in several meetings with him with a diverse group—male/female, black/white. He is respectful of opinions of others; he asked others for their opinions; and he complimented people. [Doc. 53–4 at 73].

Patrick Crawford said: Nader "is adamant and conscientious about the work. He wants you to be successful, and he wants not to have audit findings or bad financial reports." [Doc. 53–4 at 76]. Patrick Crawford said that Nader did not dominate the conversation. He's very smart and asks a lot of challenging questions. This is information that helps everybody in the room. He gives

people an opportunity to express themselves. [Doc. 53–4 at 78].

In the Second Payne Report, Smith again expressed a negative view of Sohrab. In addition to characterizing Sohrab as short-tempered and mean-spirited as before, this time Smith said "Deep down it's discrimination. He works hard to mask his prejudices, but lets them bubble up sometimes. He has a low tolerance for African–American women. He thinks we're stupid and subservient" [Doc. 54–14 at 13]. Smith gave no examples of specific incidents illustrating this discriminatory behavior.

Patrick Crawford's comments about Sohrab in the Second Payne Report differ from his comments in the First Payne Report. Specifically, Crawford said that Sohrab "treat[ed] the African–American managers differently than white managers" and "has a different tone with each group," although Crawford said that Sohrab had never yelled at him or been rude to him [Doc. 54–14 at 19]. He stated that "[Sohrab] only goes to his African–American managers when he has a complaint, but he is jovial with white managers" [*Id.*]. He stated that Sohrab "is uncomfortable with, and does not like, black people" [*Id.*]. Crawford gave no examples of specific incidents to provide a basis for these perceptions.

The October 19 letter did not specifically identify Smith and Crawford as employees "who might come forward with their own claims of race discrimination." The letter repeated the negative comments made by Smith and Crawford which were set out in the Second Payne Report. It also repeated positive comments about Sohrab made by some employees. It did say that potentially "other employees" (other than Shirley Boykin) "might come forward with claims of race discrimination or race/gen-

der discrimination." [Pl. Ex. N, Doc. 54–14 at 3].

The material in the October 19 letter and the two Payne reports did not alert Defendant to the substance of Smith and Crawford's testimony if they were to appear as witnesses.[22] In fact, many of the statements in their declarations concern different subject matter from what is referenced in the letter and the Payne reports. Rule 26(a) requires not just the identity of persons with information, but also "the subjects of that information." Fed.R.Civ.P. 26(a)(1)(A)(i). Plaintiff has not shown that her failure to provide this information to Defendant was harmless.

█ Finally, the Court notes that Plaintiff had almost three months before the close of discovery after her lawyers received the Payne reports and the October 19 letter to contact Smith and Crawford (who by then no longer worked for Defendant), for the purpose of determining whether they had relevant, helpful information and make the required Rule 26 disclosures to Defendant, including disclosure of the substance of this testimony. Instead, they delayed until it was too late for Defendant to take their depositions. This delay was not substantially justified.

The Court rejects the R & R's conclusion that Plaintiff's failure to make the required disclosures was harmless, and further finds that the failure was not substantially justified. The Smith and Crawford declarations will not be considered.

### 2. *Plaintiff's testimony about Sohrab's statement to Anita Fox in Miracle Carroll's presence*

█ The R & R cited *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1293–94 (11th Cir.2012) for the proposition that "even if the hearsay, they are only excluded from consideration on a motion for summary judgment if they cannot be reduced to admissible evidence at trial" [R & R 47]. Thus, the R & R considered Plaintiff's testimony as to what Carroll had told her that Sohrab had said, namely, that AISS's problem is that it is run by a bunch of black women. This ruling was error. First, the cited statement in *Jones* is dicta. *Jones* actually disallowed the witness's testimony. Second, in *Macuba v. Deboer,* 193 F.3d 1316 (11th Cir.1999), the Court of Appeals clarified that for testimony to be admissible, it must comply with hearsay rules. *Macuba* rejected the "reduced to admissible evidence at trial" formula articulated in Eleventh Circuit cases such as *Jones,* 683 F.3d at 1293–94, and *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1135 (11th Cir.1996). This Court reads *Macuba* to say that when hearsay is inadmissible under the Federal Rules of Evidence, it is inadmissible and cannot be considered when ruling on a motion for summary judgment. *See also Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir.2005) ("although evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment

---

**22.** Teresa Smith's declaration includes but it not limited to the following: (1) revisions to Note G were not within the control of the Fixed Assets Manager; (2) the changes to Note G made by Veralyn Frierson were both reasonable and expected; and (3) there was no required deadline for submitting final Notes. Patrick Crawford's declaration includes but is not limited to the following: (1) "After Faye Frierson was terminated, APS received an award for a good CAFR for fiscal year 2008. When I learned of the award, I looked it up and found that it was given based on the work Faye Frierson had completed."; and (2) "It was common knowledge that the issues that APS experienced with Fixed Assets were not attributable to Faye Frierson or the Fixed Assets department." None of this related to the information about Crawford's and Smith's statements as set forth in the two Payne reports and the October 19 letter.

stage, hearsay could not be reduced to admissible form") (citing *Macuba*). *Jones* can be read to rely on the idea that it is possible for hearsay which is inadmissible under the Federal Rules of Evidence to be used to oppose a motion for summary judgment. Thus, there is tension between *Macuba* and *Jones*. This is a source of confusion for many practitioners and judges, including the undersigned. Nonetheless, even if the "reduced to admissible evidence" formula of *Jones* is applied as the R & R suggests, there is no reason to think that Miracle Carroll would give trial testimony which differs from the statements in her own email to Colinda Howard. Also, Plaintiff's double hearsay testimony regarding this episode would not be admissible at trial. For these reasons alone, the R & R's conclusion admitting Plaintiff's second-hand version of Sohrab's statement is error.

The R & R also erred in citing *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir.1997), as support for admitting Plaintiff's testimony about what Carroll told her that Sohrab had said. In *Zaben*, the Court of Appeals held that double hearsay can be admissible if "both halves" of the double hearsay are admissible. *Zaben* imposed numerous restrictions including, but not limited to, the requirement that *both* declarants be supervisors/higher-ups in the company. In this case Miracle Carroll is not a supervisor or management official. *Zaben* does not apply.

In summary, the Court rejects the R & R's conclusion that Plaintiff's deposition testimony and Plaintiff's letter to Conley–Abram about what Miracle Carroll said to her about what Sohrab said to Carroll are admissible evidence. They are inadmissible hearsay.

As previously stated, Miracle Carroll's own statement (in the form of an email to

Colinda Howard) concerning what Sohrab said to her is admissible. Further, Defendant does not object to it.

■ Plaintiff's testimony that Nicole Conley–Abram (Deputy Chief Financial Officer) told her to have Miracle Carroll report her complaint to Colinda Howard in the Office of Internal Resolution is not an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(C). The R & R's conclusion to the contrary is error. This testimony is admissible, but only to explain why Carroll made a report to Howard. Conley–Abram's statement does not imply that Carroll's complaint had merit. When Conley–Abram made that statement she had only heard Plaintiff's second-hand report. An inference that Conley–Abram had made up her mind about the merits of the complaint or admitted its validity is unwarranted.

### B. *Prima Facie Case*

The R & R found that Plaintiff had established a prima facie case of race discrimination through a combination of three elements: (1) Sohrab was rude to African–American women or cut them off when they were speaking while not treating Caucasian women that way; (2) Sohrab's comment "That explains what the problem is here at APS" shows that he harbors discriminatory animus toward black women; and (3) Crissi Calhoun, a Caucasian employee, took over Plaintiff's duties after Plaintiff was fired. Defendant does not object to the R & R's determination that a prima facie case is established. The R & R's determination is not clearly erroneous and is accepted.

### C. *Defendant's Stated Reason for Terminating Plaintiff*

■ Under *Texas Department of Community Affairs v. Burdine*, once a plaintiff establishes a prima facie case, the

defendant must come forward and state a clear, reasonably specific reason for the challenged adverse employment decision. 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is a burden of production, not a burden of persuasion. *Id.* at 253–54, 101 S.Ct. 1089. The R & R recited Defendant's stated reason, as set forth in its summary judgment memorandum and in Sohrab's declaration, as follows:

> Following observations of months of unsatisfactory work—including the submission of multiple revisions of Note G, with wildly fluctuating prior year adjustment amounts—Burbridge and Sohrab had an increasingly low degree of confidence that Frierson was capable of satisfactorily doing her job and an increasingly high degree of confidence that material audit findings related to fixed assets would be reported for FY 2008.

[Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Doc. 53–1 at 8–9 (internal citations omitted) ]. The R & R added to the stated reason the following sentence which comes from Sohrab's deposition:

> ... Basically, over a two year period Ms. Frierson and the Fixed Asset Department could not accurately produce Note G and we continuously get audit findings for that for 2007 and 2008, which eventually lingered on to 2009.

[Sohrab Dep. 124–25].

 In this manner, the R & R augmented Defendant's statement of its rea-

son for firing Plaintiff. This was legally incorrect and is clear error. It is Defendant's prerogative (and obligation) "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), but "[D]efendant bears only the burden of explaining clearly the non-discriminatory reason[ ]." *Burdine,* 450 U.S. at 260, 101 S.Ct. 1089. Neither side disputes that BFW was in charge of preparing the FY 2007 audited financial statements and the FY 2007 CAFR including Note G. It is clear that the Fixed Assets unit produced most of the data for the capital assets reported in Note G for both FY 2007 and FY 2008 and that Plaintiff worked with BFW in putting together the FY 2007 CAFR and its Note G. But for FY 2007—unlike FY 2008—Plaintiff was not in charge of producing Note G. Since Defendant does not contend that Plaintiff was fired because she inaccurately produced Note G for the 2007 CAFR, it is unnecessary to decide whether it would have been justified in doing so.[23]

For analysis purposes, the Court will utilize Defendant's reason for terminating Plaintiff as set forth in Defendant's brief and Sohrab's declaration.

### D. *Pretext Analysis*

 To avoid summary judgment, Plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext." *Clark v.*

---

**23.** Defendant's brief does state that Plaintiff failed to reconcile certain CIP balances which contributed to material audit findings for the FY 2007 and FY 2008 CAFRs. It also states that she provided certain appraisals to BFW for the FY 2007 CAFR without ensuring that they were "complete, well-documented and acceptable" [Defendant's Motion for Summary Judgment, Doc. 53 at 5–6]. Also, it states that Plaintiff delayed the completion of

the FY 2007 CAFR by making multiple revisions of Note G [*Id.* at 7]. However, Defendant's brief makes it clear that "Although there were multiple contributing factors to the concerns' about Frierson's performance, her termination was precipitated by her months-long struggle to submit a final, reliable version of Note G for the FY 2008 CAFR" [*Id.* at 17–18].

*Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir.1993); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1030–31 (11th Cir.2000) (finding that an employee failed to rebut an employer's proffered reason where the reason was one that "might motivate a reasonable employer," and the plaintiff did not "meet that reason head on and rebut it."). Moreover, the Court will *not* second-guess Defendant's business judgment. *See Chapman*, 229 F.3d at 1030 ("federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions' "); *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

■ A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff either shows that a discriminatory reason more likely motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162–63 (11th Cir.2006). In doing so, the court evaluates whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact-finder could find them unworthy of credence." *Combs v. Plantation Patterns, Inc.*, 106 F.3d 1519, 1538 (11th Cir.1997).

■ The R & R determined that the comment made by Sohrab to Anita Fox in Miracle Carroll's presence is sufficient to show that Sohrab "could have harbored discriminatory animus towards African American females" [R & R 53]. The evidence shows that the conversation was as follows:

Here's the scenario (Short Version):

Co-worker's are huddled around a cubicle. A conversation started up … upper manager-Male, consultant (Blk Female), employee (Me)......needless to say, we were told that we don't listen. A consultant said, "You haven't heard that Black Women don't know how to be quiet?" I clinched my teeth. Manger said, "Oh, I got it now." Consultant continued, "My bother say that all the time about black women." Manager mumbles, "that explains what the problem is here at APS." I was stunned.

[Pl. Ex. H, Doc. 54–8 at 3–4 (errors in original) ].

Accepting, arguendo, that Miracle Carroll's statement is accurate, the Court's analysis is that Fox, an African–American consultant at AISS, made what she intended to be a light-hearted comment to which Sohrab initially sought to reply in like vein. His comments were directed to Fox, not Carroll, and were "spur of the moment." Yet, it is understandable that Carroll, who obviously did not approve of Fox's jokes, felt Sohrab was making a derogatory comment about black women. Carroll, an African–American, was an accountant in the Finance Department. The manager level in the Finance Department was exclusively comprised of African–Americans in October 2008; that group was predominantly female. Carroll undoubtedly knew that Burbridge and Sohrab believed that the Finance Department needed improvement. But the focus of the Court's analysis is Sohrab's mind-set, not Carroll's. The legal issue is whether Sohrab's comments reflect a racist bias on his part. *See Damon*, 196 F.3d at 1361 ("[The court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). This incident alone, even when based on Carroll's version of the facts, is unpersuasive on

that point. Although Fox's statements were certainly inappropriate, she clearly was joking. Sohrab was caught by surprise and responded awkwardly. Racial bias is not inferable from these comments.[24]

The R & R cites reasons for finding a prima facie case which are not separately discussed in the pretext section of the R & R. The Court will briefly address them to determine if they constitute viable proof of discriminatory bias. The R & R states that "more than one witness has testified that Sohrab's demeanor with African American employees was different from his demeanor with their white counterparts" [R & R 50–51].

 The thrust of Plaintiff's testimony was that at one or more of the managers' meetings in the Finance Department, Sohrab allowed the white female consultants who were present to speak without interruption, whereas he cut off or interrupted the black females. She also said that Sohrab did not treat African–American men poorly, but was respectful of their views. This testimony by Plaintiff does not constitute viable evidence of race discrimination. First, Plaintiff's reference to the white women who were allowed to speak at the managers' meetings was not to employees of the Defendant. The Finance Department had no white managers at that time. Plaintiff's reference was to consultants who had been brought in to assist Defendant in solving its audit problems. That being the case, it is not surprising (assuming it is true) that Sohrab tended to allow the consultants to speak more freely. He may have been trying to keep the discussion on track by averting managers' comments he did not consider helpful.

 In addition, the Court notes that the analysis it must undertake is calculated to determine whether *similarly situated* white and black persons were treated differently. It is Plaintiff's burden to establish that the two groups she seeks to compare are indeed comparators. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (stating that the plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects"); *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir.2004) ("The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.") (citing *Silvera v. Orange Cnty. Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001)). Plaintiff has not attempted to make this analysis.

 Moreover, to the extent that Plaintiff simply complains about Sohrab's "rudeness," that complaint is not viable unless it is tied to unequal treatment. Naturally, rudeness is never to be wished for in a superior or anyone else, but it does not necessarily equate to race discrimination. Also, without more explanation, it is a characterization which is too general to be analyzed by the Court. *See Holifield,* 115 F.3d at 1564 n. 6 ("conclusory assertions ... in the absence of supporting evidence, are insufficient to withstand summary judgment"); *Chapman,* 229 F.3d at 1051 n. 34 ("subjective perceptions of an employee, without more, are insufficient to survive summary judgment"). Further, the Court notes that Plaintiff's statement in her deposition that Sohrab was cordial to the African–American men in the management group undercuts her claim of race

---

**24.** While the separate statements of Anita Fox and Sohrab concerning this incident are relevant and admissible (and would be helpful to Defendant), the Court will consider only Carroll's statement in determining whether Plaintiff has presented sufficient evidence of pretext to survive summary judgment.

discrimination. The amended complaint charges only race discrimination, not sex discrimination.

 The R & R recited in its Factual Background section (but not in the Pretext section) that certain complaints were made about Sohrab's conduct toward black employees both before and after Plaintiff's termination[25] [PSMF, Doc. 55 ¶¶ 38, 241–43, 248–49]. These include the anonymous letter to Superintendent Beverly Hall that accused Sohrab of being unable to work with "diversity" [Def. Ex. 2, Doc. 58 at 104–06], two internal complaints concerning Crissi Calhoun's and Sandy Mormon's alleged abuse of Defendant's attendance and vacation policy[26] [R & R 5–6], and certain statements made in the course of Ms. Payne's investigation into an EEOC charge filed by another African–American female employee in the Finance Department, Shirley Boykin. Sohrab had hired Boykin in August 2008. The Court will not consider (and the R & R may not have considered either) the content of the anonymous letter to Dr. Hall, or the second internal complaint regarding abuse of attendance and vacation policy, because both were anonymous. *See United States v. Christopher*, 923 F.2d 1545, 1551 (11th Cir. 1991) (noting that "uncertainty as to the identity of the declarant barely rises above the level of guesswork, and implicates the concerns which justify the general prohibition on hearsay evidence; namely its lack of trustworthiness" (quotation marks and citations omitted)). The first complaint was made on January 1, 2010, a year after

Plaintiff's termination and concerns the conduct of Crissi Calhoun as supervisor of Sandy Mormon. It is not probative on the issue of Sohrab's intent in firing Plaintiff either.

Regarding Shirley Boykin's comments pertaining to her EEOC complaint, Boykin said that she found Sohrab to be "dishonest" and "abusive"; she also stated that Sohrab "discriminate[d] against black people" and "[did] not treat the white employees the way he treat[ed] African–American people" [Pl. Ex. P, Doc. 54–17 at 4]. Boykin went on to detail her substantial frustration with Sohrab's management style, which included several heated conversations with Sohrab regarding her work product, but Boykin did not state that the specific incidents were in any way connected to her race [*see generally* Pl. Ex. P, Doc. 54–17].

The Court recognizes that in an appropriate case so-called "me too" evidence may be considered to determine whether the decision-maker had the requisite intent to discriminate. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286–87 (11th Cir. 2008). However, in this case, while Boykin's statements are similar to Plaintiff's, they exhibit the same weakness in that they are conclusory. Moreover, Boykin's claim that Sohrab fired her on account of her race [Lawson Dep. 73; Pl. Ex. O, Doc. 54–16] is undercut by the fact that Sohrab *hired* her in August 2008, a little more than a year before her termination.

In finding that Plaintiff had made an adequate showing that Defendant's stated

---

**25.** Burbridge confirmed in his deposition that there were multiple employee complaints regarding Sohrab's "management style" and that he took steps to help Sohrab "improve his style" and "work[] on his communication skills" [Burbridge Dep., Doc. 58 at 80–81].

**26.** The first complaint (January 18, 2010) alleged that Crissi Calhoun, a Caucasian man-

ager, permitted Sandy Mormon, a Caucasian subordinate, to be absent from work for six days despite a deficiency of saved leave time to cover the absence [Pl. Ex. N–1, Doc. 54–15 at 4]. The second complaint (March 1, 2010) was anonymous and accused Calhoun of being absent from work without accounting for the time on her accrued leave [*Id.* at 5].

reason for firing her was pretextual, the R & R relied on a misstatement as to the breadth of Defendant's stated reason and on evidence in the Smith declaration which is no longer before the Court. The evidence in Smith's declaration would be irrelevant anyway because it does not matter what arrangements were made with other departments to produce their parts of the FY 2008 CAFR; Sohrab was entitled to exercise his business discretion in this regard.

The R & R found that Plaintiff had put forward evidence which tended to prove that Defendant's stated reason for firing Plaintiff is unworthy of credence. It noted that Plaintiff had received "a positive employment evaluation from Sohrab in September 2008" [R & R 54]. It overlooked the context of the discussion, admitted by Plaintiff in her deposition [Pl. Dep. 263–64]. Also, it failed to take to take into account the timing of the comment. Sohrab's comment is significantly devalued by its timing and the fact that he and Plaintiff were not talking about Note G during their September 2008 discussion. Sohrab became Controller in mid-May of 2008. He had no tangible evidence of Plaintiff's work on the FY 2008 Note G until September 18, 2008. Therefore, the Court does not find Sohrab's comments to Plaintiff concerning her performance of the duties set forth in the job description particularly probative in determining whether Defendant's stated reason for terminating Plaintiff is unworthy of credence.

*Defendant's evidence*

Defendant states its decision to terminate Plaintiff was made "following observations of months of unsatisfactory work— including the submission of multiple revisions of Note G, with wildly fluctuating prior year adjustment amounts." Defendant states that this process yielded "an increasingly low degree of confidence that Frierson was capable of satisfactorily doing her job and an increasingly high degree of confidence that material audit findings related to fixed assets would be reported for FY 2008." In support of its stated reason Defendant points to numerous emails between Plaintiff and Sohrab from September 2008 through January 2009, plus five revisions of the FY 2008 Note G which Plaintiff prepared and sent to Sohrab as attachments to some of these emails.

The first version of Note G (September 18) was incomplete, but the Note itself explains why some of the dollar amounts (CIP transfers, prior year adjustments for charter schools) were missing. Also, Plaintiff testified in her deposition that the dollar amounts for CIP and Charter Schools did not come from the Fixed Assets unit. She testified that Sohrab was supposed to supply these dollar amounts to her.[27] She also stated in the September 18 version of Note G that she needed help from the IT department on depreciation problems. Plaintiff has not, however, offered any explanation for why capital leases were not mentioned at all in the portion of September 18 Note G which addressed items which would need to be added with Sohrab's help. Plaintiff either knew, or should have known, that capital leases were reportable in Note G because she

---

27. Plaintiff's testimony on this point is somewhat confusing. Data for all of AISS's capital/fixed assets was supposed to be recorded in the A/M module. If so, it should have been readily available to Plaintiff. In that event, it would not have been necessary for Sohrab to seek out records from departments other than Fixed Assets and take them to Plaintiff. Perhaps the data from other departments for FY 2008 (which ended June 30, 2008) had not all been entered into the system as of September of 2008. The Court accepts Plaintiff's explanation as true for purposes of this Order.

participated in the FY 2007 Note G preparation, which reflected an ending value of $13,785,648 for capital leases [Doc. 53–7 at 44]. Without any explanation by Plaintiff, the suggestion is raised that Plaintiff simply overlooked capital leases in the September 18 version of Note G. This version of Note G made an aggregate prior year adjustment of $53,627,370 [Doc. 54–23 at 91–93].[28]

The October 20 version of Note G was attached to an email to Sohrab which said in part "I now consider Note G complete."[29] This version added $25,549,191 for CIP transfers. It made a prior year adjustment of $16,000 to the Charter Schools beginning balance and made various adjustments for disposals, acquisitions and "CIP transfers" changing the ending balance to $5,844,799. However, the October 20 version did not mention capital leases, which had had an ending balance of $13,785,648 for FY 2007. The October 20 version of Note G made an aggregate prior year adjustment of $44,959,314.

The November 12 version of Note G made net additions to the value of the "Buildings" asset class, yielding an ending value of $882,817,880. It recommended a prior year adjustment of $78,038,806. It did not mention capital leases.

Sohrab pointed out to Plaintiff in a November 18 email that the figures in one of the lines in the November 12 revision of Note G did not add up; she admitted that this was due to an overlooked item, "Nutrition Business type" [Doc. 54–23 at 105].

As previously stated, the November 26 revision of Note G was marked "draft" and was forwarded to Sohrab with an email which said "Attached is the revised Note G for FY 2008 to reflect the Beginning Balances that you submitted for the CAFR." The only beginning balance changed was for "Buildings," increasing this figure to $900,828,140. For the first time, this version of Note G included capital leases at a beginning balance of $13,785,648. It also added a capital asset entitled "Education Reform Success"[30] in the amount of $7,609,587. Because the Education Reform Success item was not reported in the FY 2007 Note G [see Doc. 53–7 at 44], the Court observes that it may have been a new item for FY 2008. Still, Plaintiff can be faulted for failing to inquire about the items which would need to be reported in Note G for FY 2008. Again, the record contains no explanation concerning why capital leases and Education Reform Success appeared on the November 26 version of Note G but not previously. The November 26 version of Note G made an aggregate prior year adjustment of $48,068,489.

On January 21, 2009, Plaintiff sent a revised version of Note G to Sohrab. This version did not include capital leases or Education Reform Success, even though they had been included in the November 26 version of Note G. Plaintiff has offered no explanation for this apparent discrepan-

---

**28.** Note G covers two groups of capital assets: those involved in "governmental activities" and those involved in "business-type activities." The great bulk of AISS's capital assets are in the governmental activities group, and the Court refers to the aggregate prior year adjustments for the governmental activities group as do the parties.

**29.** When asked about this statement in her deposition, Plaintiff said that she had meant

that "the numbers that would be coming from [her] group would be complete" [Pl. Dep. 224]. There is no evidence, however, that she communicated her mental reservation to Sohrab or anyone else.

**30.** The record does not disclose the nature of this item, other than to describe it as a capital asset.

cy. The January 21 version of Note G made an aggregate prior year adjustment of $67,619,048.

Plaintiff sent one last revision of Note G to Teresa Smith (Manager of Financial Reporting), with copy to Sohrab, on January 23, 2009. The email identified its subject as "Note G Capital Leases—Final." This version did include capital leases in the list of assets at a beginning balance of $13, 785, 648. This version added a prior year adjustment for capital leases of $2,638,066 for an ending balance of $11,147,582. This version did not mention Education Reform Success even though it had been included before in the November 26 version. Plaintiff has offered no explanation for this apparent discrepancy. The January 23 revision of Note G made an aggregate prior year adjustment of $75,730,498. Less than a week after Sohrab's receipt of this last revision, he recommended to Burbridge that Plaintiff's employment be terminated.

Plaintiff's only efforts to explain the cited discrepancies in the various versions of Note G are set forth in her 2012 deposition: (1) when she sent the October 20, 2008 email stating that she considered Note G complete, she had made a misstatement; what she really meant was that the Note was complete for assets for which the Fixed Assets unit had created the data; (2) with respect to the assets for which the data did not emanate from the Fixed Assets unit, Plaintiff was relying on Sohrab or others to get the data to her; to whatever extent it was not reflected in Note G it was because others (Sohrab or other groups or departments) had failed to provide the data to her; (3) Note G was a work in progress; by its very nature no deadline could be set; and (4) she suspected that someone was accessing the spreadsheet she used to make calculations for Note G; this may have affected the accuracy of the revisions of Note Gs she produced.

These explanations, however, do not mesh with the undisputed facts in this case. The undisputed evidence shows that in September and October of 2008, Plaintiff actually acquired the data for CIP and Charter Schools. This data was included in the October 20 revision of Note G. The asset group not addressed by this explanation is capital leases, which Plaintiff knew or should have known had to be included in Note G. That being the case, capital leases should have been included in the part of the September 18 Note G where Plaintiff indicated that she was waiting for information from other departments if that indeed was the problem. Capital leases should also have been included in the October 20 version of Note G. With no explanation from Plaintiff, the Court is left with the impression that the omission of capital leases was overlooked by Plaintiff until someone called it to her attention on or about November 26, at which time it was added to Note G. That said, capital leases as well as Education Reform Success disappeared from the subsequent revision dated January 21, a seemingly careless omission. Capital leases were added again in the January 23 version of Note G, but Education Reform Success was dropped, another seemingly careless omission. Plaintiff's claim that she did the work on Note G as soon as could be reasonably expected, though not within Sohrab's deadline, is largely irrelevant. Defendant did not fire Plaintiff because she did not meet the September 15 deadline. Obviously, Defendant felt that as of January 30, 2009 she had had more than enough time to complete the task. Defendant had made it clear, by setting the September 15 deadline, that Note G was a priority item and that its efficient completion was important. Finally, Plaintiff produced no tangible evidence that anyone had accessed her

spreadsheet; at best this was only her speculation.

Defendant specifically noted in its statement of reasons for terminating Plaintiff that each of the five versions of Note G had significantly different aggregate prior year adjustments. Plaintiff has offered no explanation for this fact. The prior year adjustments for all asset classes should have been figured by starting with the ending balances in BFW's Note G in the FY 2007 CAFR. The record contains an email from Plaintiff to Conley–Abram in which Plaintiff said Sohrab had told her they had to use the ending values furnished by BFW; she was resistant to this idea because BFW's ending values were different from the ending values submitted by Fixed Assets to BFW for FY 2007 [*see* Pl. Ex. Q, Doc. 54–18].

The net of the foregoing is that there is evidence which objectively supports Defendant's belief that Plaintiff did not perform adequately in preparing Note G for FY 2008. Because Note G represents a summary of AISS's capital asset activity for the fiscal year, Defendant was justified in fearing that more audit problems were imminent, and in concluding that Plaintiff would not be a help in solving audit problems.

Even if Defendant's decision to terminate Plaintiff was ill—advised, the Court is in no position to doubt—and Plaintiff does not refute—that AISS believed that terminating Plaintiff was the best course of action given the numerous audit problems during her tenure. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

In summary, Plaintiff has not shown that there is significantly probative evidence that Defendant's stated reason for terminating her is merely pretext. There is also no genuine issue of material fact which precludes judgment in Defendant's favor. Accordingly, Defendant's objection to the R & R's pretext conclusion is SUSTAINED.

### III. *Conclusion*

For the reasons stated above, Defendant's objections [Doc. 73] are SUSTAINED, the R & R [Doc. 70] is ADOPTED IN PART and REJECTED IN PART, and Defendant's Motion for Summary Judgment [Doc. 53] is GRANTED.